STATE OF WEST VIRGINIA *v.* JOHNSON CORLEY

(No. 8092)

Submitted October 8, 1935.  Decided November 26, 1935.

*Wm. T. George* and *Wysong & Wysong,* for plaintiff in error.

*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

KENNA, JUDGE:

Johnson Corley was convicted in the circuit court of Webster County of involuntary manslaughter, and on the 20th day of September, 1934, was sentenced to serve seven months in the Webster County jail, and to be fined $50.00. To that judgment, he prosecutes this writ of error.

The assignments of error are based upon the alleged insufficiency of the state's proof, and upon instructions given on behalf of the state and refused on behalf of the defendant. There is little, if any, material conflict in the testimony of the witnesses as to what took place. We therefore do not deem it necessary to recount the evidence of each individual witness. We believe that a resume of the state's evidence will be sufficient to test the assignments of error.

Shortly after noon, on the 31st day of August, 1934, Johnson Corley went to Carpenter's restaurant in Main Street in the town of Webster Springs. Facing toward State Route No. 15, in a northwesterly direction, the restaurant is on the left-hand side of the street, and the turn toward Cowen at the intersection of Main Street with State Route No. 15 is toward the left. In the restaurant Corley met acquaintances, among them Ivy Tharp, who bought a bottle of beer of which they each drank half. These two then left the restaurant for the purpose of going for a ride in Corley's car, a 1934-model Chevrolet coupe, that was parked outside the restaurant facing toward State Route No. 15. On the sidewalk, they met one Peggy Reed, who was asked to go with them, and Pete Ramsey, who started also to get into the car with the other three. Ramsey was told by Corley that he could not get on the single seat of the coupe with the three other occupants and that if he wished to go, he had better get into the "turtle-back" of the car. The other occupants of the car supposed that Ramsey had gotten into the "turtle-back" of the car, and there is testimony tending to show that before the car started he did in fact lift the lid of the back compartment. The testimony, however, shows that instead of getting into the "turtle-back," as a matter of fact, Ramsey, as Corley was backing the car so that he could get around another parked immediately in front of him, or just after he had backed it and was slowly starting forward, clambered upon the "turtle-back." All the proof shows Ramsey to have been definitely drunk and staggering. After the party had started along Main Street, Ivy Tharp says that she glanced back and saw Ramsey perched upon the "turtle-back" of the car, but there is no testimony indicating how far before his fall it was that

she saw him, nor does she say that she communicated to Corley the fact that he was upon the ''turtle-back'' instead of inside of it. As the car turned into State Route No. 15 at its intersection with Main Street, towards the left and in the direction of Cowen, Ramsey lost his balance on the ''turtle-back'' so that after the car had made the turn, he fell from his perch some twelve to thirty-five feet, according to the estimates of the witnesses, along State Route 15, going off on the right-hand side of the car and striking his head and shoulders in such way that he was rendered unconscious and died that night at an Elkins hospital. The proof as to the speed of the car, according to the state's case, varies from ten to thirty miles an hour at the time that it was making the curve. After Ramsey fell from the car, Corley proceeded some little distance, but slowed down and stopped upon being informed by Ivy Tharp that Ramsey had fallen from the ''turtle-back.'' The two women got out of the car while it was still moving and ran back to where Ramsey was. Corley remained in the car and stood for two or three minutes after which he proceeded until he had crossed both bridges and gotten up on the side of the hill, where, in attempting to turn his car, he wrecked it by backing it over an embankment. He did not return to the place where Ramsey had been injured, but stayed to attend to his automobile until a deputy sheriff came to the scene where his car was wrecked. In a discussion with the deputy sheriff, in the presence of other witnesses, Corley was heard to say in response to inquiry that he had no women in his car and that nobody had fallen from it. The deputy sheriff had brought the two women with him in his car, and Ivy Tharp testifies that Corley asked her if she was going to state that she had been with him in his car and that she told him that she would have to so state. The testimony of the state shows that Corley was in second gear around the curve. The testimony further shows that Corley, after telling Ramsey to get inside the ''turtle-back'' before or at the time of starting, asked him if he was all right, and received an affirmative reply from either Ramsey or someone standing nearby. The distance from the point that Corley started from to the intersection where he made the turn is

estimated by the only witness for the state who mentioned it to be about 200 feet.

The state argues that because Ramsey was known by Corley to be unquestionably drunk, staggering and in a semi-helpless condition and was permitted by Corley to get into a position on his car which, in view of the circumstances, and in view of the speed made by Corley's car in making the turn at the intersection, resulted in his serious injury and death, that Corley failed to exercise that degree of care that he owed to Ramsey and was guilty of such negligence as will sustain the verdict of involuntary manslaughter. The state grounds its position in the first place upon a violation of Code, 17-8-12. That section provides, in effect, among other things, that upon approaching a sharp turn or a sharp curve and in traversing such turn or curve, the person operating a motor vehicle shall reduce its speed so as not to exceed fifteen miles per hour, and that any turn or curve designated by a sign or marker under the provisions of that chapter shall be conclusively presumed to be a sharp turn or sharp curve. We do not believe that the state's evidence shows a violation of the section relied upon. There is no evidence that there was such a sign designating the curve at Main Street and State Route No. 15 as would bring into play the conclusive presumption of the statute. If the presumption of the statute is not brought into play, then the question depends, of course, upon other proof, and, without discussing the nature of the proof that would be required, we can not agree that the evidence here is sufficient to show a violation of the statute. The question is whether this curve has been proved by the state to be a sharp turn or sharp curve within the meaning of the statute. This, in turn, would, we believe, depend upon the width of both Main Street and State Route No. 15 at this point. If they were both extremely narrow, the curve to be made would be one thing. If, on the other hand, they were both extremely broad, the curve to be made would be something entirely different. If, on the other, the condition at this particular intersection falls between these two extremes, then it would still be the burden of the state to establish that a sharp turn or sharp curve within the intendment of the statute existed before a violation of the statute could be shown. This, we believe, the state's

evidence here does not do. We can not say, simply because Main Street intersected Route 15 at right angles, that the curve to be made in entering one from the other was a "sharp curve" within the meaning of the statute as a matter of law. This brings us to consider whether Corley was guilty of such negligence, under the state's proof and eliminating the question of whether he violated the statute, as will sustain a conviction of involuntary manslaughter.

In dealing with this question, we are asked by the plaintiff in error to view the state's proof as failing to show that Corley knew that Ramsey was perched upon the "turtle-back" of the car and that, for this reason, his conduct did not amount to negligence of the reckless or wanton degree that would justify a conviction of involuntary manslaughter. The defense argues that it was not the duty of Corley to see that Ramsey was in a safe place before he started out in his car, or that if it was Corley's duty to see that Ramsey was in a safe place, the non-performance of that duty does not amount to criminal negligence. It might be that in a proper case, the question of the degree of negligence of the defendant would, upon an admitted state of facts, constitute a question of law for the court. Here, however, we do not think we have that sort of case. Corley, himself, is the only witness who can state positively whether or not he knew that Ramsey was on the "turtle-back" of the car. In addition to being the defendant with an obvious self-interest in the outcome of the trial, there is a very serious impeachment of Corley's veracity based upon the deception with which the state charges him of being guilty shortly after Ramsey was injured. There is also his conduct in failing to go back to the injured man, and other circumstances in the case that would make it entirely possible that the jury might disbelieve any material part of Corley's testimony that was not corroborated. Then, too, the duty of Corley would depend to a large degree upon the state of intoxication of Ramsey, and while the record is not particularly clear on this point, it might be that the jury would believe Ramsey to have been intoxicated, in spite of the fact that he was able to clamber upon the "turtle-back" of the car, to an extent that would have greatly accentuated

any sort of negligence that they might have believed Corley to have been guilty of. Under all the circumstances, and viewing the record in its entirety, we are of the opinion that the proof is sufficient to carry the case, under proper instructions, to the jury.

Another assignment of error relates to the impeachment of the witness, Ivy Tharp, by showing prior inconsistent statements that she had made. Defendant's counsel requested the court to instruct the jury that the evidence in contradiction was to be weighed for that purpose only, and not as evidence going to the guilt or innocence of the accused. We are of the opinion that the court should not have failed to make this distinction clear.

The defendant complains of the rejection of his instruction No. 2. Much of this instruction deals with voluntary manslaughter. This offense was out of the case, and the rejection of the instruction would have been justified upon that ground alone. Furthermore, the instruction contains a direction to the jury to acquit the defendant in the event they find he was not engaged in the performance of an unlawful act at the time of the injury to Ramsey. This ignores the fact that the wantonly negligent performance of a lawful act may result in involuntary manslaughter. Either the nature of the act itself, or its manner of performance may give rise to the offense.

The defendant complains here of state's instruction No. 2, which was given as modified by the trial judge. It reads as follows:

"The Court instructs the jury that it is unlawful in this State for any person to permit another to ride in or on his automobile at any place therein or thereon other than the inside of said automobile in the places therein provided for passengers; and if the jury believe from the evidence in this case beyond all reasonable doubt that the defendant Johnson Corley knowingly permitted the said Pete Ramsey to ride on his car and at such place thereon which was not provided or equipped for passengers to ride and that, as a result thereof, the said Pete Ramsey fell or was thrown from said car while it was in motion, and received injuries from which he later dies, then

the jury should find the defendant guilty of involuntary manslaughter as charged in the indictment.''

The state argues that this instruction was harmless error. We can not agree with this conclusion. It is admitted in the brief for the state that there is no authority to be found in the statutes of this state nor even in any regulations of the Road Commission or the Department of Public Safety that will sustain the proposition enunciated in this instruction. We have been unable to find anything that would sustain it. The same statement applies to a part of state's instruction No. 1.

For the reasons stated, the judgment of the circuit court of Webster County is reversed, the verdict set aside and the defendant awarded a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*